IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LEE NERREN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-2205 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Pending before the court[2] are Defendant's Cross-Motion for Summary Judgment (Doc. 13) and Plaintiff's Motion for Summary Judgment (Doc. 19). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

### I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1] Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

[2] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. <u>See</u> Doc. 12, Ord. Dated Sept. 29, 2016.

disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act ("the Act").

## A. Medical History

Plaintiff was born on May 31, 1967, and was forty-six years old on the alleged disability onset date of June 29, 2013.[3] Plaintiff, who holds a General Equivalency Diploma (GED), worked as a painter from June 1998 to January 2001 and as a welder/boiler maker from September 2001 to October 2011.[4]

### 1. Physical

The medical records generally support a history of heart disease, including two heart attacks and a coronary artery bypass graft in the years 2010 and 2011.[5] On February 27, 2013, Plaintiff sought emergency treatment for chest pain, which led to a three-day hospitalization.[6] The treating cardiologist determined that the chest pain did not have a cardiac origin.[7]

From June 14, 2013, to December 16, 2015, Plaintiff sought treatment at Tomball Regional Medical Center emergency room many times for various conditions, including tooth pain resulting from

---

[3]     See Tr. of the Admin. Proceedings ("Tr.") 353-67.

[4]     See Tr. 404, 414-15. At the hearing, Plaintiff clarified that he had worked as a combined welder/boiler maker. See Tr. 42, 82.

[5]     See Tr. 516, 525.

[6]     See Tr. 511-43.

[7]     See Tr. 521.

biting on a popcorn kernel, hip pain, an arm laceration resulting from breaking a window, a hand contusion from punching a wall, a head laceration from performing housework, an accidental finger incision during dinner preparation, and congestion/bronchitis.[8] In August 2013, Plaintiff presented to the emergency room experiencing involuntary movement of his arms, neck, and head and was diagnosed with dystonic reaction to medications.[9]

Two years later, in December 2015, he returned to the emergency room twice in three days, complaining of episodic shakes on the first visit and of "intermittent feeling of shaking in his upper body and insides and burning sensation internally" on the second visit.[10] The same attending physician treated Plaintiff on both occasions.[11] The physician first diagnosed Plaintiff with shaking spells and discharged Plaintiff with information about dystonias.[12] Two days later, the physician diagnosed Plaintiff with resting tremor, hot flashes, acute anxiety, and leukocytosis (high white cell count) and discharged Plaintiff upon improvement with information about tremors and generalized anxiety disorder.[13]

---

[8] See Tr. 1138-48, 598-605, 607-13, 679-89, 997-1005, 1226-40, 1292-1308.

[9] See Tr. 642-47.

[10] See Tr. 1410, 1425.

[11] See Tr. 1409-33.

[12] See Tr. 1427.

[13] See Tr. 1414.

During the two-and-a-half-year period referenced above, Plaintiff visited the emergency room no fewer than a dozen times for treatment of back pain and/or neck pain and/or flank pain.[14] Another frequent complaint registered by Plaintiff at other emergency room visits was chest pain.[15] On October 7 and 14, 2013, Plaintiff sought emergency treatment for chest pain.[16] On the first of the two visits, Plaintiff was diagnosed with chest pain and headache and was discharged.[17] On the second, Plaintiff was diagnosed with costochondritis, which is the noncardiac inflammation of the chest area, and was discharged.[18]

On June 10, 2014, Plaintiff returned to the emergency room complaining of chest pain.[19] The treating physician diagnosed the pain as musculoskeletal and discharged Plaintiff.[20] In October 2014 and June 2015, Plaintiff was admitted for observation but was diagnosed with chest pain of a noncardiac origin.[21] In October 2015, Plaintiff again sought emergency treatment for chest pain but was discharged with a diagnosis of chest pain and instructions to

---

[14]    See Tr. 631-37, 648-78, 989-96, 1015-1026, 1130-37, 1156-72, 1249-82.

[15]    See Tr. 590-97, 614-21, 622-30.

[16]    See Tr. 614-30.

[17]    See Tr. 625.

[18]    See Tr. 617.

[19]    See Tr. 589-97.

[20]    See Tr. 592.

[21]    See Tr. 1173-1205, 1309-39.

follow up on an outpatient basis.[22]

## 2. Mental

In addition to the above discussed physical conditions, the medical records include documentation of mental impairments.[23]

### a. Doctor Appointments

On November 7, 2012, Nadeema Akhtar, M.D., ("Dr. Akhtar") evaluated Plaintiff for the first time.[24] According to the psychiatric assessment, Plaintiff's complaints were anxiety, depression, anger, and agitation that started after Plaintiff's bypass surgery.[25] Plaintiff reported that he first became depressed when he could not perform his job due to an inability to concentrate and that he began feeling sad and anxious and experiencing sleep disturbance.[26] Plaintiff admitted a life-long history of anger issues, but described more recent symptoms as anxiety, sweating, tingling of fingers, muscle tension, amplification of sound, tunnel vision, loss of interest in activities, low self esteem, guilt, helplessness, mood swings, and ruminative thoughts.[27]

---

[22]    See Tr. 1434-44.

[23]    See, e.g., Tr. 546-49.

[24]    See Tr. 424, 546-49. Dr. Akhtar's psychiatric assessment is in the record more than once. See, e.g., 1372-75.

[25]    See Tr. 546.

[26]    See id.

[27]    See id.

Plaintiff reported two prior psychiatric hospitalizations, one due to a suicide attempt and one due to an intentional overdose of Seroquel (a medication used to treat schizophrenia and bipolar disorders) with alcohol.[28]  He also stated that he had been on several courses of psychotropic medications without success due to concurrent alcohol consumption and that he was currently taking Xanax (a medication used to treat anxiety and panic disorders), as well as medications for hypertension, hypercholesteremia, and chest pain.[29]  Although Plaintiff admitted an extensive history of alcohol and drug usage, including cocaine, methamphetamine, and cannabis, he stated that he had not consumed alcohol in the last six months and had not used drugs in nearly a year.[30]

Dr. Akhtar diagnosed Plaintiff with major depressive disorder, anxiety disorder, alcohol dependence, and cocaine abuse.[31]  She found him to be depressed, anxious, and irritable with appropriate affect, goal directed thought processes, no hallucinations, no suicidal or homicidal ideation, poor concentration, and fair insight and judgment.[32]  Dr. Akhtar identified problems with finances, work, access to healthcare, and social environment and

---

[28]   See id.

[29]   See Tr. 547-48.

[30]   See id.

[31]   See Tr. 550.

[32]   See Tr. 548.

determined Plaintiff's Global Assessment of Functioning ("GAF") to be fifty out of one hundred, a score at the high end of the category for "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning."[33] The doctor ordered laboratory and medical testing, provided Plaintiff with information about his diagnosed disorders, and prescribed Zoloft (a medication used to treat depression, panic attacks, and other disorders), Atarax (a medication used in this case to treat anxiety), and Ambien (a medication used to treat sleep disorders).[34]

The record does not contain any indication that Plaintiff received treatment for the subsequent nine months after his evaluation. On August 12, 2013, without seeing Plaintiff on that day, Dr. Akhtar wrote a letter to Plaintiff's counsel at that time, opining that Plaintiff was "unable to hold a job at [that] time due to the inability to get stable."[35] Dr. Akhtar represented that Plaintiff had been her patient for the prior nine months but had not responded well to several different medications.[36] In further support of her opinion that Plaintiff was unable to work, Dr. Akhtar stated, "He remains depressed, anxious, and unable to sleep

_____

[33]     Tr. 550-51; Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which abandoned the GAF scale in favor of the World Health Organization Disability Assessment Schedule 2.0).

[34]     See Tr. 548-49.

[35]     Tr. 424.  This letter is in the record more than once.  See, e.g., Tr. 438, 1037, 1383.

[36]     Tr. 424.

7

well.  He also has fleeting suicidal thoughts.  He is under stress due to multiple medical and financial problems."[37]

In an October 2013 diagnosis form, Dr. Akhtar carried the same psychiatric diagnoses from her assessment nearly a year prior, as well as the previous GAF score of fifty and the previously identified psychosocial and environmental problems.[38]  The earliest treatment note in the record from a routine psychiatric appointment was a medication maintenance note from November 25, 2013.[39]  Dr. Akhtar stated that Plaintiff's mood "continue[d] to stay easily agitated" and that he was still waiting to receive disability benefits but that the financial stress had decreased because his wife was employed.[40]  He denied suicidal or violent thoughts and reported sleeping and eating well.[41]

Other than marking "irritable" to describe Plaintiff's mood and noting limitations in his fund of knowledge and intellectual functioning, Dr. Akhtar marked every aspect of the mental status exam as within a normal range.[42]  For example, she noted that Plaintiff's motor activity was normal, his speech was normal, his

---

[37]  Id.

[38]  See Tr. 1370

[39]  See Tr. 567-70.  This record is duplicated at Tr. 1366-69.

[40]  See Tr. 567.

[41]  See id.

[42]  See Tr. 568-69.

affect was appropriate, his thought process was logical, his immediate recall, recent and remote memory were intact, his attention span, concentration, insight, and judgment were all good.[43]

When Dr. Akhtar saw Plaintiff for the second time, three-and-one-half-months later, he reported that he was not doing well because he had served jail time for unpaid traffic tickets and had fought with a neighbor, noting that he tended to get in arguments with managers and to be overprotective of his wife.[44] Dr. Akhtar assessed Plaintiff's mental status as the same as the previous appointment except that she found Plaintiff easily distracted with a poor fund of knowledge.[45] She prescribed new medications for Plaintiff.[46]

According to the records, Plaintiff began cognitive behavioral therapy and case management on April 15, 2014.[47] On April 23, 2014, Plaintiff returned for medication maintenance, cognitive behavioral therapy, and case management.[48] Plaintiff reported doing well and appeared better to Dr. Akhtar, although he remained isolated and

---

[43]    See id.

[44]    See Tr. 563.

[45]    See Tr. 564-65.

[46]    See Tr. 566.

[47]    See Tr. 575-76.

[48]    See Tr. 559-62, 573-74.

easily irritated.[49]  Dr. Akhtar adjusted Plaintiff's medication and indicated that the treatment plan was to continued therapy and medication monitoring.[50]  The treating counselor noted that he reported an up-and-down mood and showed progress toward his goals.[51] Dr. Akhtar and the counselor both performed mental status examinations.[52]  Dr. Akhtar found everything within normal limits except for limited fund of knowledge and average intelligence; the counselor found everything within normal limits except for fair judgment and insight.[53]  On that same day, Dr. Akhtar penned a letter "To Whom it may Concern" recommending "that [Plaintiff] not attempt work" because he had difficulty "working due to severe anxiety and depression which cause[d] body shaking, sweating, mood swings, etc."[54]  She represented that Plaintiff had experienced "minimal benefits" from medication trials.[55]

   In May and June, Plaintiff received case-management services twice.[56]  On August 6, 2014, Plaintiff returned for medication

---

[49]   See Tr. 559.

[50]   See Tr. 562.

[51]   See Tr. 571.

[52]   See Tr. 560-61, 571.

[53]   See id.

[54]   Tr. 425.  This letter is in the record more than once.  See, e.g., Tr. 437, 1038, 1039, 1384.

[55]   Tr. 425.

[56]   See Tr. 571-72.

maintenance, cognitive behavioral therapy, and case management.[57] Dr. Akhtar opined that Plaintiff was very depressed due to the denial of disability benefits and his wife's loss of employment.[58] The counselor noted that Plaintiff reported feeling irritable and experiencing increased shaking, and the counselor observed motor agitation and euthymic mood with congruent affect.[59] In a diagnosis form from that date, Dr. Akhtar added a diagnosis of personality disorder, not otherwise specified, but made no other changes to the prior diagnoses of depression, anxiety, alcohol dependence, or cocaine abuse.[60] She also identified the same psychosocial and environmental problems as previously noted and opined that Plaintiff's GAF score remained at fifty.[61]

On August 25, 2014, Plaintiff received cognitive behavioral therapy and case management.[62] After that, Plaintiff did not return again until November 21, 2014, on which occasion he received medication maintenance.[63] Dr. Akthar did not see Plaintiff that day, but the psychiatrist who examined Plaintiff opined that he

---

[57]  See Tr. 974-77, 980-81.

[58]  See Tr. 974.

[59]  See Tr. 980-81.

[60]  See Tr. 972.  This diagnosis form is duplicated in the record.  See Tr. 1364-65.

[61]  See id.

[62]  See Tr. 978-79.

[63]  See Tr. 1359-63.

seemed worse, noting pressured speech and fidgetiness and recording Plaintiff's reports of decreased energy, sadness, irritability, anxiety, and fast thoughts.[64]

On September 3, 2015, Daniel J. Fox, Ph.D., ("Dr. Fox") examined Plaintiff on behalf of the SSA.[65] Dr. Fox reviewed Plaintiff's treatment records, interviewed Plaintiff, and administered psychiatric tests.[66] Plaintiff reported that he received therapy from a psychologist one to two times a month at his home and saw a psychiatrist for medication maintenance.[67] Plaintiff said that "his treatment ha[d] been helpful in identifying his mental issues, as well as working through his mood symptoms."[68]

Plaintiff and his wife described Plaintiff's symptoms, activities of daily living, and social functioning.[69] According to Plaintiff, he was able to complete simple tasks, but tremors made the tasks more difficult.[70] He stated that he was not able to complete complex tasks, which Dr. Fox found consistent with

---

[64]  See Tr. 1359.

[65]  See Tr. 1064-77.

[66]  See id.

[67]  See Tr. 1066.

[68]  Id.

[69]  See Tr. 1065-67.

[70]  See Tr. 1067.

Plaintiff's behavior during the evaluation.[71]

In testing on his intellectual functioning, Plaintiff scored in the low average range for all indices except the processing speed index, which registered in the extremely low range.[72] Dr. Fox noted that Plaintiff's "greatest difficulty" was "his ability to process[] information in a timely and efficient manner" but opined that "his fine motor functioning and tremors likely lowered his scores on th[e] index and [the] result should be taken with caution."[73] Dr. Fox found it likely that Plaintiff experienced difficulty thinking and reasoning equal to his peers, particularly in "sustaining attention, concentrating, processing visual material without error, reasoning verbally and spatially, and holding information in short-term memory."[74] Plaintiff evidenced "decreased capability for visually mediated tasks and those mediated tasks which require[d] psychomotor speed and efficiency due to fine motor impairment."[75]

Dr. Fox described Plaintiff as appropriate and cooperative but tense and restless.[76] The doctor stated that Plaintiff "appeared

---

[71]   See id.

[72]   See Tr. 1069.

[73]   Tr. 1070.

[74]   Id.

[75]   Tr. 1071.

[76]   See 1064.

to have significant difficulties with processing speed, comprehension, working memory, and spatial reasoning."[77] Dr. Fox further opined:

> [Plaintiff] appeared to have difficulty with fine motor coordination (i.e., tremors; difficulty gripping a pencil and writing words) as well as gross motor coordination (observed limp). Speech was interpretable but often difficult to understand due to stuttering. Moderate problems were observed with comprehension, though [Plaintiff] demonstrated understanding of task instructions and was able to maintain working knowledge of instructions for the duration of a subtest.[78]

Dr. Fox diagnosed Plaintiff with borderline intellectual functioning, adjustment disorder with mixed anxiety and depressed mood, and cocaine and alcohol use disorders, both in early full remission.[79] According to the doctor, Plaintiff's prognosis was fair assuming he were able to gain access to regular physician care, physical or occupational therapy, speech therapy, continued psychotherapy, and pharmacological treatment.[80] With regard to Plaintiff's residual functional capacity ("RFC"), Dr. Fox opined:

> [Plaintiff] ha[d] the ability to understand, carry out, and remember instructions for one-two step instructions [sic], but ha[d] difficulty with complex instructions. He is limited in his ability to sustain concentration and persist in work-related activity at a reasonable pace and without fatigue. He has limited interest in maintaining social interaction with supervisors, co-workers, and the public. He is currently unable to manage routine

---

[77] Tr. 1064-65.

[78] Tr. 1065.

[79] See Tr. 1071.

[80] See id.

14

pressures in a competitive work setting.[81]

The next psychiatric treatment note in the record was dated September 11, 2015, approximately ten months after the last prior appointment.[82] On that occasion, Dr. Akhtar noted that Plaintiff had started taking lithium and that the results were positive.[83] Plaintiff reported that his mood was "even keel," he was sleeping well, he was less angry and depressed, he was walking about three miles per day, and he had not experienced any "temper tantrums."[84] Despite Plaintiff's positive reports, Dr. Akhtar found that Plaintiff's GAF score remained at fifty but dropped the previously identified problem of access to healthcare.[85] In the diagnosis form that Dr. Akhtar completed on that day, she replaced Plaintiff's diagnoses of major depression, anxiety, and substance dependence/abuse with bipolar, most recent episode depression in partial remission and most recent episode mixed without psychotic features.[86] She continued the diagnosis of personality disorder.[87]

**b. Emergency Room Visits**

---

[81]     Tr. 1071-72.

[82]     See Tr. 1344-47.

[83]     See Tr. 1344.

[84]     Id.

[85]     See Tr. 1348.

[86]     See id.

[87]     See id.

While under the care of Dr. Akhtar, Plaintiff reported to the emergency room five times related to Plaintiff's inclination to harm himself. In July 2014, Plaintiff cut his left wrist but reported that he was not experiencing suicidal ideation.[88] He reported being upset about the denial of disability benefits.[89] Medical personnel sutured the laceration and released Plaintiff for outpatient follow up.[90]

In November 2014, Valeria Contreras, M.D., ("Dr. Contreras") performed an emergency psychiatric evaluation of Plaintiff.[91] His chief complaint was that "[e]verything [was] just piling up on [him]" and that he was experiencing the non-suicidal desire to cut himself.[92] He reported feeling guilty for past substance abuse and other past actions and feeling unable to control his urges to cut, especially when alone.[93] Plaintiff stated that his medications had not been keeping him stable for the prior several months.[94] Plaintiff further described his then-current symptoms as including depressed mood, insomnia, low energy, variable appetite, and

---

[88] See Tr. 1006-13.

[89] See Tr. 1006.

[90] See 1008-09.

[91] See Tr. 1396-1401.

[92] Tr. 1396.

[93] See id.

[94] See Tr. 1396; Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000).

auditory hallucinations featuring his name.[95]

Dr. Contreras opined that Plaintiff's GAF score was 35 (in the middle of the category for major impairment in several areas), modified Plaintiff's medications, and ordered an intramuscular dose of Benadryl.[96] Plaintiff remained at the hospital, sleeping for most of the day.[97] Upon assessment that evening, Plaintiff reported feeling "much better" after sleeping.[98] The examining physician at that time recorded a normal mental status examination with fair judgment and insight and assessed Plaintiff a GAF score of fifty-five to sixty (at the high end of the category for moderate difficulty).[99]

On three occasions in the summer of 2015, Plaintiff sought treatment for self-inflicted arm lacerations.[100] On the first occasion, Plaintiff described feeling depressed.[101] The physician closed the wound with staples and discharged Plaintiff.[102]

On the second occasion, Plaintiff explained that he had "had

---

[95]    See Tr. 1396, 1399.

[96]    See Tr. 1399; Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000).

[97]    See Tr. 1400.

[98]    Id.

[99]    See Tr. 1401.

[100]    See Tr. 1114-29, 1149-55, 1212-25.

[101]    See Tr. 1219.

[102]    See Tr. 1218-19.

a bad day recently and cut himself . . . to try and get some relief."[103] He stated that he was experiencing anxiety and sleeping problems but denied depression, suicidal ideation, homicidal ideation, or the desire to harm himself further.[104] The physician sutured the laceration and discharged Plaintiff.[105]

On the third occasion, Plaintiff stated that he was experiencing depression, anxiety, and agitation due to financial and housing difficulties and cut himself to relieve emotional pain, anxiousness, and stress.[106] After suturing the laceration, the physician discharged Plaintiff.[107]

B. **Application to Social Security Administration**

Plaintiff first applied for disability insurance benefits and supplemental security income in 2012, and those claims were closed in January 2014 after the Appeals Council's review.[108] On May 5, 2014, Plaintiff again filed applications for disability insurance benefits and supplemental security income, claiming an inability to work since June 29, 2013, due to bypass surgery, depression, anxiety, agoraphobia, panic attacks, coronary artery disease,

---

[103]    Tr. 1150.

[104]    See Tr. 1150, 1152.

[105]    See Tr. 1152-53.

[106]    See Tr. 1115.

[107]    See Tr. 1121-22.

[108]    See Tr. 157, 195. The ALJ's decision date for Plaintiff's 2012 applications was June 28, 2013. See id. Therefore, the earliest possible onset date for the current applications was June 29, 2013. See Tr. 401.

hypertension, high cholesterol, and heart attack.[109]

On June 30, 2014, the SSA found Plaintiff not disabled at the initial level of review.[110] The medical expert who reviewed the record and completed the physical RFC assessment found Plaintiff capable of frequently lifting or carrying twenty-five pounds, standing and/or walking for six hours in an eight-hour day and sitting for six hours in an eight-hour day with no additional limitations.[111]

The medical expert who reviewed the record and completed the Psychiatric Review Technique and Mental RFC Assessment found that Plaintiff did not meet the requirements of any of the listings of the regulations[112] (the "Listings").[113] With regard to Plaintiff's mental RFC, she found that Plaintiff had no limitation in concentration and persistence and that, although he had understanding and memory limitations and social interaction limitations, he was moderately limited only in the areas of detailed instructions, interaction with the general public, and interaction with supervisors and not significantly limited in any

---

[109]   See Tr. 156-57, 353-67, 377.   An SSA employee completed the applications for Plaintiff online on May 5, 2014.  See Tr. 368.

[110]   See Tr. 165-66, 176-77, 178-79.

[111]   See Tr. 161-62, 172-73.

[112]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[113]   See Tr. 159-60, 170-71.

area.[114]  In the expert's opinion, Plaintiff could "understand, remember, carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods[,] . . . accept instructions[,] and respond appropriately to changes in a routine work setting."[115]

In a function report completed in July 2014, Plaintiff's wife reported that Plaintiff experienced shortness of breath, panic attacks, depression, hypertension, nervous shakes, and an inability to tolerate crowds.[116]  Plaintiff's wife listed Plaintiff's waking activities as making coffee if the "shake[s]" were not too bad, dressing, and watching television.[117]  His wife stated that she had to remind him to feed the pets, to put on clean clothes, to tend to his personal hygiene, and to take his medication.[118]

Plaintiff's wife also reported that Plaintiff did not complete any house or yard work, did not go outside "hardly ever," could not handle being around people, did not drive, did not shop, and got upset and shaky when trying to deal with money.[119]  According to the report, Plaintiff's impairments affected every physical ability

---

[114]    See Tr. 162-63, 173-74.

[115]    Tr. 163, 174.

[116]    See Tr. 436.

[117]    Tr. 439.

[118]    See Tr. 439-40.

[119]    See Tr. 440-41.

except talking and seeing and every mental ability except understanding.[120] The wife reported that Plaintiff was able to walk no further than a few steps before requiring rest for "a long period of time," was able to pay attention for only a "very short time," and was not able to follow written or spoken instructions well.[121]

In a function report completed by his wife in September 2014, she again reported that Plaintiff experienced shakiness and lightheadedness and described Plaintiff as having a tendency to become upset and an inability to interact with others or follow instructions.[122] The wife further stated that Plaintiff became anxious or nervous and started to shake upon going outside, shopping, or handling money and that he did not drive for that same reason.[123]

Regarding his abilities, Plaintiff's wife stated that he was limited in all of the physical and mental activities listed due to exhaustion but specifically identified lifting, squatting, bending, walking, kneeling, stair climbing, remembering, completing tasks, concentrating, following instructions, and getting along with

---

[120]    See Tr. 443.

[121]    See id.

[122]    See Tr. 454-58.

[123]    See Tr. 456.

others.[124] "Using Hands" was not marked as affected by his impairments.[125]

Upon reconsideration of the initial denial, the SSA again found Plaintiff not disabled.[126] The medical expert who reviewed the record and completed the physical RFC assessment found Plaintiff capable of frequently lifting or carrying only ten pounds but agreed with the prior RFC assessment regarding Plaintiff's ability to stand and/or walk and sit and regarding his lack of limitation on pushing and/or pulling.[127] She imposed additional postural limitations not recognized at the initial level but no other limitations.[128]

The medical expert who reviewed the record and completed the Psychiatric Review Technique and Mental RFC Assessment found that Plaintiff did not meet the requirements of any Listing.[129] With regard to mental RFC, she agreed with the prior mental RFC assessment on understanding and memory limitations and social interaction limitations but found that Plaintiff was moderately limited in the one additional area: the ability to carry out

---

[124]    See Tr. 459.

[125]    See id.

[126]    See Tr. 193, 207-09.

[127]    See Tr. 188, 202-03.

[128]    See Tr. 188-89, 202.

[129]    See Tr. 186-87, 200-01.

detailed instructions under the category of sustained concentration and persistence.[130] She echoed, word for word, the prior expert's opinion on Plaintiff's ability with regard to detailed but not complex instructions, decision making, attention and concentration, instructions, and changes in work setting.[131]

On October 26, 2014, Plaintiff requested a hearing before an administrative law judge ("ALJ") of the SSA.[132] The ALJ granted Plaintiff's request and conducted a hearing on June 11, 2015.[133] However, that hearing was continued because Plaintiff appeared without representation and the ALJ decided to allow Plaintiff an opportunity to obtain counsel.[134] The ALJ also ordered a consultative examination, which Dr. Fox conducted on September 3, 2015.[135] After Plaintiff's counsel filed an Appointment of Representative form, the ALJ rescheduled the hearing for February 8, 2016.[136]

**C.  Hearing**

At the hearing, Plaintiff and his wife as well as a vocational

---

[130]    See Tr. 190-91, 203-05.

[131]    Compare Tr. 163, 174 with Tr. 191, 205.

[132]    See Tr. 235.

[133]    See Tr. 89-96, 244.

[134]    See Tr. 89-94.

[135]    See Tr. 94.

[136]    See Tr. 266-67.

expert, Vickie D. Colenburg ("Colenburg"), and a medical expert, George Lazar, Ph.D., ("Dr. Lazar"), testified.[137]  Plaintiff was represented by an attorney.[138]

When the ALJ asked Plaintiff which medication caused him to experience tremors, Plaintiff specifically named Lithium (a medication used to treat bipolar disorder) and Zyprexa (a medication used to treat schizophrenia, bipolar disorder, and, in combination with other medication, depression), both of which he had been taking for fewer than six months at the time of the hearing.[139]  After a few other questions about Plaintiff's past work and past substance abuse, the ALJ turned to questioning Dr. Lazar.[140]

According to Dr. Lazar, the record reflected that, when Plaintiff was sober and received mental health treatment, he showed improvement.[141]  Dr. Lazar also stated that Plaintiff had relapsed in 2015.[142]  Dr. Lazar found that the most recent mental health records indicated that Plaintiff was improving on Lithium and explained that, whether Plaintiff's diagnoses of bipolar disorder

---

[137]    See Tr. 38-88, 342, 344.

[138]    See Tr. 40.

[139]    See Tr. 41.

[140]    See Tr. 42-44.

[141]    Tr. 45.

[142]    Id.

and personality disorder met or equaled any of the disorders described in the Listings depended on Plaintiff's substance abuse.[143] "[W]ith drugs, he meets [Listing] 12.04 [(Affective Disorders)] and [Listing] 12.06 [(Anxiety and Obsessive-Compulsive Disorders)], but without drugs when he's sober, he meets only paragraph A of [Listing] 12.04 and [Listing] 12.08 [(Personality and Impulse-Control Disorders)]."[144] Dr. Lazar opined that Plaintiff's rating was moderate in the paragraph B categories of activities of daily living, attention and concentration, and socialization.[145] Plaintiff's attorney argued that Dr. Lazar's view of Plaintiff's substance abuse "colored the doctor's whole testimony as to whether or not [Plaintiff met] a listing, and it even colored his testimony as to his interpretation of Dr. Daniel Fox's consultative evaluation."[146]

Dr. Lazar and Plaintiff's attorney discussed Dr. Fox's report at length, and Dr. Lazar pointed to what he believed to be errors in Dr. Fox's report, suggesting that the examiner "lack[ed] . . . concentration," was not "very familiar" with the SSA's definitions, or "made a mistake."[147] Relying on Dr. Fox's comments on processing

---

[143]  See Tr. 46.

[144]  Id.

[145]  Id.

[146]  Tr. 68.

[147]  See Tr. 51-59.

25

speed, Dr. Lazar stated:

> And we know that [Plaintiff] has severe tremors, and that
> the examiner mentioned that his fine-motor functioning
> and tremors likely lowered the scores.  So that 53 maybe
> does not reliably reflect his real processing speed.  If
> you take out the motor component, probably it would have
> been higher.[148]

Upon questioning by Plaintiff's attorney, Dr. Lazar stated
that the etiology of cutting behavior can be anger, lack of
feeling, or need for attention.[149]  Dr. Lazar said that the record
from the July 2014 cutting incident did not specify an etiology.[150]
With regard to how cutting behavior fits into the Listings, Dr.
Lazar said that individuals with borderline personality disorders
engaged in self-mutilation and that Plaintiff was diagnosed with a
personality disorder.[151]  Plaintiff, however, did not meet the
severity for the paragraph B criteria.[152]

Plaintiff's attorney questioned Plaintiff about several
issues.[153]  In the course of the questioning, Plaintiff stated that
he had a herniated disc and that he experienced difficulty walking,
bending, and stooping.[154]  Plaintiff also stated that he stopped

---

[148]    Tr. 60.

[149]    See Tr. 67.

[150]    See id.

[151]    See id.

[152]    See Tr. 67-68.

[153]    See Tr. 69-76.

[154]    See Tr. 71.

using drugs and consuming alcohol on June 3, 2011, and denied a relapse in 2015.[155]

Plaintiff stated that he had not driven in the prior two years because he was unable to "focus and concentrate good enough."[156] Plaintiff stated that he slept between five and seven hours each night and awoke to "everyday worries."[157] He added that he returned to sleep mid-morning for about three hours.[158] Plaintiff said that his wife would ask him to take care of certain things at the house while she was at work, but he was not always able to complete the tasks because he would forget.[159] He also stated that he had trouble writing his name "because I'm nervous, nervousness and shaking."[160] In response to the question whether the shaking ever stopped, Plaintiff said, "It seems like sometimes when I first get up in the mornings, I'm kind of calm, you know, until the day gets going, and go to thinking [sic]."[161] Plaintiff described his cutting behaviors in this manner:

> I get -- I want so much more for my family than I've been able to give, and like just worrying about things, it manifests in me. And when I do it, it's like I told the

---

[155]   See Tr. 72.

[156]   Tr. 74.

[157]   Id.

[158]   See Tr. 75.

[159]   See id.

[160]   Id.

[161]   Id.

doctor, it sounds stupid.  It's like a zone.  I just need
some relief, and it gives me relief for a few seconds.
It doesn't hurt for that little bit.  It's my way out
without having to involve anybody, anybody else, or hurt
anybody else.[162]

Plaintiff's wife followed him on the stand.[163]  Plaintiff's
wife testified that Plaintiff had not been the same person since he
had a heart attack, listing in particular Plaintiff's "handling
things," "his nervousness, his shaking," and "[h]is whole
disposition."[164]  The wife confirmed that Plaintiff stopped drinking
in 2012 and that he had not used drugs or consumed alcohol since
then.[165]

Plaintiff's medication negatively affected his memory, his
wife said, and she called him three to four times a day while she
was at work to inquire whether he had taken his medications and
whether he was completing the tasks she had asked him to do.[166]  On
her days off, Plaintiff's wife said, she observed Plaintiff lying
down for three to four hours and attributed it to fatigue from the
medication.[167]

At the conclusion of Plaintiff's wife's testimony, Colenburg

---

[162]    Tr. 75-76.

[163]    See Tr. 76.

[164]    Tr. 78.

[165]    See Tr. 78-79.

[166]    See Tr. 80.

[167]    See Tr. 81.

took the stand to discuss Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[168] Colenburg considered Plaintiff's welder job to be at a medium exertional level and skilled and his boiler maker job to be at a heavy exertional level and skilled.[169]

The ALJ presented the following hypothetical individual:

> Assume he had a residual functional capacity to do light work, lift up to 20 pounds occasionally, lift and carry up to 10 pounds frequently; stand and walk six out of eight, sit six out of eight; no ladders, ropes, or scaffolds. The rest of the postural limitations [would] be frequent. Overhead reaching, reach, handle, finger, and feel bilaterally would be frequent. No moving machinery or unprotected heights and open flames. Simple work, no tandem, no team work, no pace work, and occasional contact with coworkers and the public.[170]

Colenburg stated that such an individual would be able to perform work as an office cleaner, laundry folder, non-postal mail clerk, all of which were categorized as light and unskilled.[171] The ALJ adjusted the hypothetical person's limitations to only occasional fine motor movements with frequent gross motor movements, and Colenburg said that such a person could perform the three identified jobs.[172]

Plaintiff's attorney asked Colenburg to "[a]ssume that the

---

[168] <u>See</u> Tr. 82-87.

[169] <u>See</u> Tr. 82.

[170] Tr. 82-83.

[171] <u>See</u> Tr. 83.

[172] <u>See</u> <u>id.</u>

hypothetical individual could not complete a task in a timely manner."[173] After Plaintiff's attorney clarified that timely manner meant workmanlike manner, Colenburg said that the person would not be able to maintain competitive employment.[174] In a detailed discussion with Plaintiff's attorney, Colenburg explained that the three cited jobs involved "one, two, three steps but just simple, routine work that an individual is doing constantly, every day, all day, the same job" and that, in her opinion, a hypothetical individual capable of one, two step tasks would be able to perform all three cited jobs but certainly the laundry folder position.[175] She also clarified that the three jobs all required gross handling but not fine fingering.[176]

## D. **Commissioner's Decision**

On October 24, 2014, the ALJ issued an unfavorable decision.[177] The ALJ found that Plaintiff met the requirements of insured status through December 31, 2016, and that Plaintiff had not engaged in substantial gainful activity from June 29, 2013, the alleged onset date, through the date of the ALJ's decision.[178]

---

[173]   Id.

[174]   See Tr. 84.

[175]   See Tr. 84-85.

[176]   See Tr. 85.

[177]   See Tr. 9-31.

[178]   See Tr. 12, 14-15.

The ALJ recognized the following impairments as severe: depression, anxiety, drug and alcohol abuse, obesity, and coronary artery disease.[179] However, he found that Plaintiff's back issue was not a severe impairment and that Plaintiff's borderline intellectual functioning and intellectual disability were not medically determinable impairments.[180] The ALJ thoroughly discussed Plaintiff's medical treatment for his impairments, including Dr. Akhtar's notes and Dr. Fox's evaluation.[181]

Concerning Dr. Akhtar, the ALJ discussed the doctor's August 2013 and April 2014 letters and found that the opinions expressed in those letters were conclusory and not consistent with her underlying treatment notes and the medical record as a whole.[182] He also stated that Dr. Akhtar failed to take into consideration Plaintiff's substance abuse or Plaintiff's admission that psychotropic medications previously had not worked due to his ongoing substance abuse.[183] The ALJ also noted the inconsistency between Dr. Akhtar's generally unremarkable mental health findings and her regular assessment of GAF scores in the range of serious

---

[179]    See Tr. 15.

[180]    See id.

[181]    See Tr. 15-20, 25-28.

[182]    See Tr. 19, 27-28.

[183]    See id.

symptoms.[184]  As a result, the ALJ afforded Dr. Akhtar's opinions little weight.[185]

The ALJ found Dr. Fox's opinions entitled to some weight with regard to his suggested RFC but found Dr. Fox's opinions only partially supported by his findings and the record as a whole.[186] The ALJ also noted that both Dr. Fox and Dr. Lazar questioned the validity of the processing-speed test results because of the effect of Plaintiff's tremors on testing.[187]  The ALJ afforded significant weight to Dr. Lazar's opinions, finding them to be consistent with the record as a whole.[188]

At the Listing step, the ALJ found that Plaintiff met the requirements of several mental health listings "[i]n the presence of substance abuse" but met none if the abuse were discontinued.[189] Based on the ALJ's determination that Plaintiff did not meet a Listing when sober, the ALJ continued his analysis to the RFC step assuming the discontinuation of substance abuse.[190]  He found that

---

[184]     See Tr. 26, 29.

[185]     See Tr. 19, 26, 27, 29.

[186]     See Tr. 20, 27-28.

[187]     See Tr. 20, 24, 28.

[188]     See Tr. 20, 27.

[189]     Tr. 16-22.  Pointing out the conflicting sobriety dates reflected in the record, the ALJ explained that, if substance abuse is a contributing factor material to the determination, then the disability analysis is based on whether Plaintiff would be found disabled if he discontinued the use of drugs or alcohol.  See Tr. 13, 16-17, 20, 30-31 (citing 20 C.F.R. §§ 404.1535, 416.935).

[190]     See Tr. 22.

Plaintiff, absent substance abuse, would have the RFC to perform light work as defined in the regulations with the following limitations: "no climbing ladders, ropes, or scaffolds; frequent bending, stooping, kneeling, crouching, and crawling; frequent overhead reaching, reaching, handling, fingering, and feeling bilaterally; no exposure to moving machinery, unprotected heights, or open flames; simple work; no tandem, teamwork, or pace work; and occasional contact with coworkers and the public."[191]

In reaching the RFC assessment, the ALJ discussed Plaintiff's testimony, his wife's reports and testimony, and Dr. Lazar's testimony in addition to the medical evidence.[192] The ALJ particularly relied on Dr. Lazar's testimony that Plaintiff showed improvement when sober and when taking Lithium, and that, although Plaintiff experienced moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace, he experienced no episodes of decompensation and was capable, when sober, of understanding and remembering 1-2-3 step instructions, sustaining concentration at a reasonable pace, managing routine pressures in a competitive setting.[193]

The ALJ found Plaintiff unable to perform his past relevant work of welder and boiler maker based on the vocational testimony

---

[191]    Tr. 22-23.

[192]    See Tr. 23-24.

[193]    See id.

at the hearing.[194]    Because the ALJ found Plaintiff unable to perform a full range of light work, the ALJ proceeded to consideration of whether there were a significant number of jobs in the national economy that Plaintiff could perform.[195]    Based on Colenburg's response to the ALJ's hypothetical question asking whether a person with Plaintiff's age, education, work experience, and RFC could perform any such job, the ALJ stated that he found Plaintiff capable of performing the requirements of the unskilled occupations of office cleaner, laundry folder, and non-postal mail clerk.[196]    Therefore, the ALJ found that Plaintiff was not disabled.[197]

Plaintiff appealed the ALJ's decision, and, on May 19, 2016, the Appeals Council denied Plaintiff's request for review.[198]    The Appeals Council's ruling transformed the ALJ's decision into the final decision of the Commissioner.[199]    After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by this court.[200]

## II.  Standard of Review and Applicable Law

---

[194]    See Tr. 29.

[195]    See Tr. 30.

[196]    See id.

[197]    See Tr. 31.

[198]    See Tr. 1-3, 5-6.

[199]    Tr. 1.

[200]    See Doc. 1, Pl.'s Orig. Compl.

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

**A.  Legal Standard**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no

matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.   Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.

1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision contains the following errors: (1) failure to properly evaluate Dr. Akhtar's opinion; and (2) failure to consider in developing the RFC all limitations resulting from Plaintiff's fine motor functioning and tremors. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A. The ALJ Properly Evaluated Dr. Akhtar's Opinion

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ is required to give good reasons for the weight given a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

> When the determination or decision . . . is a denial[,]
> . . . the notice of the determination or decision must
> contain specific reasons for the weight given to the
> treating source's medical opinion, supported by the

37

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5.

The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; he is not required to record in writing every step of the process. 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following

38

factors in deciding the weight we give to any medical opinion.")(emphasis added).

Plaintiff acknowledges that a treating physician's opinion "as to whether a claimant has the **ability** to work is a finding reserved to the Commissioner."[201] Plaintiff continues:

> However, Plaintiff submits that Dr. Akhtar's **advisory**, based on her long history of treating with Plaintiff, that Plaintiff 'should not attempt to work' is a medical indication that working may cause Plaintiff's condition to worsen. Thus, it is not a finding as to Plaintiff's 'disability,' but, instead, it is more akin to prescribed medical treatment by a physician. As this Court is aware, the regulations will find a claimant's failure to follow prescribed medical treatment to be grounds for finding a claimant is not disabled. Here, however, by finding that Plaintiff is not disabled, the Commissioner is essentially requiring the claimant to not follow the advice of her treating psychiatrist.[202]

While admittedly clever, Plaintiff's artificial conundrum is wholly frivolous.

Dr. Akhtar's opinion expressed in the April 2014 letter "To Whom it may Concern" is not even arguably a "prescribed medical treatment" and, by its own wording, was not directed to Plaintiff at all.[203] Nothing in Dr. Akhtar's medication maintenance note from that day reflected that part of Plaintiff's treatment plan was to "not attempt work."[204] In fact, Dr. Akhtar's recorded treatment

---

[201]    Doc. 19, Pl.'s Mot. for Summ. J. p. 6 (emphasis in original)(citing 20 C.F.R. § 404.1527).

[202]    Id. pp. 6-7 (emphasis in original).

[203]    Id. p. 7; Tr. 425.

[204]    Tr. 425.

plan was to continue therapy and medication maintenance.

Plaintiff also contends that the ALJ failed to provide the required detailed analysis of Dr. Akhtar's opinion. This argument evidences a misinterpretation of the legal requirements and a misreading the ALJ's decision. As explained above, when an ALJ is not required to discuss all of the factors outlined in the regulations when giving a treating physician's opinion less than controlling weight. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ is only required to give good reasons that are sufficiently specific for subsequent reviewers to understand the weight given and the reasons for the weight given a treating physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *5.

Here, the ALJ did discuss the weight that he gave to Dr. Akhtar's opinion, specifically noting that her failure to consider Plaintiff's substance abuse or his admission that prior medication trials had failed due to substance use supported his decision to afford Dr. Akhtar's opinion less than controlling weight. The ALJ added that Dr. Akhtar's records reflected essentially normal mental status exams; yet, she, throughout her treatment, she did not change Plaintiff's GAF score to reflect his level of functioning.[205] Based on these observations, the ALJ determined that the doctor's

---

[205] Even when Dr. Akhtar noted positive results from Lithium, a level mood, improved sleep, decreased anger and depression, and increased exercise, she did not improve Plaintiff's GAF score. See Tr. 1344-47.

opinion regarding Plaintiff's inability to work was not supported by medical evidence that demonstrated a complete inability to work.

The court further notes that the record reflects no treatment by Dr. Akhtar between when she first evaluated Plaintiff in November 2012 and the August 2013 letter she wrote opining that Plaintiff was "unable to hold a job."[206] The initial evaluation cannot be said to support that conclusion and neither can nine months without treatment. At the time of that letter, Dr. Akhtar could not have been considered even a treating physician as she had seen Plaintiff only once. Her representation in the letter that Plaintiff had not responded well to several medications clearly did not emanate from her own treatment of Plaintiff because no record indicates that she prescribed various medication trials. Rather, the representation appears to be based on Plaintiff's admission to Dr. Akhtar at the evaluation that several medications had not worked due to his alcohol use.

Without a doubt, the ALJ fulfilled his obligations to evaluate Dr. Akhtar's opinion and to express good reasons for the weight the ALJ afforded it.

---

[206]    Tr. 424.
    Plaintiff suggests that Dr. Akhtar's opinion on Plaintiff's inability to maintain employment is consistent with Dr. Fox's opinion that Plaintiff was unable to manage routine pressures in a competitive work setting. While the court finds that Plaintiff is reading more into the two doctors' opinions in order to find mutual support, the court notes that, regardless, Dr. Fox's opinion is directly contradicted by the medical expert initially reviewing Plaintiff's application. See Tr. 163, 174. The ALJ is tasked with resolving all conflicts in evidence.

**B.   The ALJ Considered All Limitations Supported by the Record**

A claimant's RFC is his remaining ability to work despite all of the limitations resulting from his impairment.  See 20 C.F.R. §§ 404.1545(a); 416.945(a).  In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).  The regulations provide that, although the opinion of a treating physician regarding a claimant's RFC must be considered, the ultimate responsibility for determining this issue lies with the ALJ.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).

Plaintiff argues the ALJ failed to incorporate the effects of Plaintiff's difficulty with fine motor functioning and tremors into the RFC, stating that Dr. Fox, Dr. Lazar, and the ALJ found: "psychological testing indicating that Plaintiff ha[d] extremely low processing speed [was] likely affected by his limitations in fine motor functioning and tremors."[207]  Putting it in other terms, Plaintiff proffers that "the doctors and ALJ [found] that, but for Plaintiff's tremors, Plaintiff's processing speed may have been higher."

---

[207]    Doc. 19, Pl.'s Mot. for Summ. J. p. 8.

In actuality, the opinions of both Dr. Fox and Dr. Lazar did not take the position that Plaintiff's fine motor functioning and tremors lowered his processing speed but that the test results were possibly skewed because those limitations interfered with the testing of processing speed. So, Plaintiff's argument rests on an improper premise, to wit, that the fine motor limitations and tremors lowered his processing speed. They may have lowered his test score, not his processing speed, meaning that Plaintiff's processing speed may actually have been faster than the results suggested. Dr. Fox and Dr. Lazar agreed that the results were not completely reliable.

Plaintiff also argues that his fine motor limitation prevented him from performing frequent handling and, therefore, from performing any of the jobs cited. Plaintiff cites the Dictionary of Occupational Titles as including frequent handling for all three identified job titles.

Dr. Fox did note that Plaintiff exhibited fine motor limitations in that he had difficulty gripping a pencil and writing words and that Plaintiff experienced tremors, but the only observed difficulty with gross motor coordination was a limp. Despite Dr. Fox's opinion, the ALJ did not include fine motor limitations in Plaintiff's RFC. However, at the hearing, the ALJ modified his initial hypothetical person's limitations to only occasional fine motor movements and frequent gross motor movements, which is

consistent with Dr. Fox's opinion.

Colenburg responded that such a person could perform the work of office cleaner, laundry folder, non-postal mail clerk with those additional limitations. The Fifth Circuit has held that a vocational expert "is familiar with the specific requirements of a particular occupation, including working conditions and attributes and skills needed." See Carey, 230 F.3d at 145 (quoting Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986). Colenburg's description of the job requirements provided sufficient support for her opinion. Colenburg's testimony in response to the modified hypothetical question, which included all of the limitations supported by the record, provides substantial evidence in support of the ALJ's finding of non-disability, rendering the ALJ's exclusion of a fine motor limitation from his final RFC to be harmless error.

To the extent the ALJ erred in not including a limitation to occasional fine motor functioning, the error was harmless as the determination of non-disability was supported by the vocational expert's testimony.

## C. The ALJ's Decision is Affirmed

The court finds that the ALJ applied the proper legal standards in evaluating the evidence and in making his determination. The decision finding Plaintiff not disabled is supported by substantial record evidence. Therefore, the ALJ's

decision is affirmed.

## IV. Conclusion

Based on the foregoing reasons, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

**SIGNED** in Houston, Texas, this <u>29</u>th day of September, 2017.

_____
U.S. MAGISTRATE JUDGE